# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **HELEN M. CORREIA,** | ) | |
| Plaintiff | ) | Civil Action No. 2:21cv00008 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By: PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

### *I. Background and Standard of Review*

Plaintiff, Helen M. Correia, ("Correia"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Correia protectively filed applications for DIB[2] and SSI on June 15, 2018, alleging disability as of July 11, 2017, due to a back injury;

---

[2] Correia previously filed an application for DIB on October 22, 2014, alleging disability as of October 22, 2014. (R. at 64.) By decision dated July 10, 2017, the ALJ denied her claim. (R. at 64-73.) The decision denying Correia's claim was upheld by the Appeals Council. (R. at 81.)

Pursuant to the Fourth Circuit's opinion in *Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473 (4th Cir. 1999), and in accordance with Social Security Acquiescence Ruling, ("AR"), 00-1(4), "[w]hen adjudicating a subsequent disability claim arising under the same…title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence" and consider its persuasiveness in light of all relevant facts and circumstances. A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 17162 (Jan. 12, 2000). It is noted that, when *Albright* was decided, the agency "weighed" opinion evidence under different standards. *See* 56 Fed. Reg. 36932-01 at *36960, 1999 WL 142361 (Aug. 1, 1991). Those standards have been superseded by 20 C.F.R. §§ 404.1520c 416.920c, which prescribes how to consider persuasiveness of opinion evidence and prior administrative findings in claims made on or after March 27, 2017. Because this claim was made after March 27, 2017, the ALJ is required to consider prior ALJ decisions and Appeals Council findings under *Albright. See* Program Operations Manual System, ("POMS"), DI 24503.005, available at http://policy.ssa.gov/poms.nsf/lnx/0424503005 (effective Apr. 13, 2021) (explaining the categories of evidence).

The ALJ in this case noted he reviewed the previous July 2017 decision and found it to be partially persuasive. (R. at 13.) The ALJ noted the record did not support the limitations regarding only four hours of standing and/or walking in an eight-hour workday, pushing/pulling with the upper and lower extremities and frequent reaching. (R. at 13.) Based on this, I will not address Correia's argument that she would be rendered disabled pursuant to the Medical Vocational Rules, ("the Grids"), if the ALJ in this pending case would have adopted the prior ALJ's opinion concerning her ability to stand and or walk for four hours in an eight-hour workday. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 7.) In addition, the ALJ found Correia's mental impairments were severe in contrast to the non-severe finding in the prior ALJ decision. (R. at 13.)

fibromyalgia; hypertension; gastritis; ulcers; gallstones; depression; and heart issues. (Record, ("R."), at 12, 240-41, 244-47, 273, 311.) The claims were denied initially and on reconsideration. (R. at 154-56, 161-63, 167-69, 171-78, 180-82.) Correia requested a hearing before an administrative law judge, ("ALJ"). (R. at 184-85.) A hearing was held on February 25, 2020, at which Correia was represented by counsel. (R. at 34-60.)

By decision dated March 13, 2020, the ALJ denied Correia's claims. (R. at 12-28.) The ALJ found Correia met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2018. (R. at 15.) The ALJ found Correia had not engaged in substantial gainful activity since July 11, 2017, the alleged onset date. (R. at 15.) The ALJ determined Correia had severe impairments, namely fibromyalgia; degenerative disc disease; osteoarthrosis and allied disorders; anxiety and obsessive-compulsive disorders; and depressive, bipolar and related disorders, but he found Correia did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15-16.)

The ALJ found Correia had the residual functional capacity to perform light[3] work, except she could stand, walk and sit six hours each in an eight-hour workday; push/pull as much as the lift/carry restrictions; occasionally climb, balance, stoop, kneel, crouch and crawl; occasionally work at unprotected heights and around hazardous machinery; perform simple, routine tasks; make simple work-related decisions; and occasionally interact with supervisors, co-workers and the public. (R. at 18.) The ALJ found Correia was unable to perform any of her

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2021).

past relevant work. (R. at 26.) Based on Correia's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Correia could perform, including the jobs of a marker, a clothing bagger and a router. (R. at 27-28, 57-58.) Thus, the ALJ concluded Correia was not under a disability as defined by the Act, and she was not eligible for SSI and DIB benefits. (R. at 28.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2021).

After the ALJ issued his decision, Correia pursued her administrative appeals, (R. at 183, 366-67), but the Appeals Council denied her request for review. (R. at 1-5.) Correia then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2021). This case is before this court on Correia's motion for summary judgment filed August 18, 2021, and the Commissioner's motion for summary judgment filed August 30, 2021.

## II.  Facts

Correia was born in 1967, (R. at 240), which, at the time of the ALJ's decision, classified her as a "person closely approaching advanced age" under 20 C.F.R. §§ 404.1563(d), 416.963(d). Correia obtained a general educational development, ("GED"), diploma, and she has past relevant work as a certified nursing assistant, ("CNA"), and a massage therapist. (R. at 41-42, 57, 274.) Correia stated she could not reach overhead, bilaterally. (R. at 46-47.) She stated that, because of her depression, she isolated herself, including from her family. (R. at 48-49.) While Correia stated she would not even talk to her family on the phone or computer, she admitted she talked to them on Facebook "sometimes." (R. at 49.)

She stated she had a few close friends that she talked to "every once in a while." (R. at 50.) Correia stated she had no desire to go places and she had difficulty staying focused due to pain. (R. at 53.)

In rendering his decision, the ALJ reviewed records from Richard Luck, Ph.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; Dr. Andrew Bockner, M.D., a state agency physician; Dr. Wyatt S. Beazley, III, M.D., a state agency physician; Dr. Samuel D. Breeding, M.D.; The Health Wagon; Mountain View Regional Medical Center, ("Mountain View"); HMG Urgent Care; Dr. Wendy Abbott, D.O.; Family Preservation of Virginia; Wellmont Cardiology Services; and Norton Community Hospital.

The medical evidence shows Correia suffered a work-related back injury in August 2012. (R. at 593.) On August 23, 2012, x-rays of Correia's lumbar spine showed mild disc space narrowing at the L5-S1 level. (R. at 593.) In October 2012, an MRI of Correia's lumbar spine showed desiccation at the L4-L5 and L5-S1 levels and slight retrolisthesis of the L5-S1 level associated with disc bulging and spondylitic spur formation, resulting in a mild mass effect upon the ventral aspect of the thecal sac and possible mild displacement of the dural exit site for the left S1 nerve root. (R. at 590.) In 2015, Correia participated in physical therapy for displacement of the lumbar intervertebral disc without myelopathy, thoracic or lumbosacral neuritis and lumbar sprain. Correia had pain with active range of motion of her lumbar spine and was discharged with minimal improvement in her symptoms. (R. at 520-68.)

During the relevant time period,[4] Correia was treated at The Health Wagon for fibromyalgia, migraine headaches, hypertension and back pain. Correia's examination findings showed positive fibromyalgia tender points and positive straight leg raise testing but generally good physical findings overall, including, no swelling or deformity in the lumbosacral spine; her musculoskeletal system had normal range of motion with no edema, clubbing or cyanosis in her extremities; her cognition was grossly normal; her motor strength was normal in both the upper and lower extremities; she had intact sensation; her judgment and insight were good; her mood and affect had full range; she made good eye contact; and her speech was clear.[5] (R. at 375-76, 380, 384-85, 388, 390, 394, 411, 413-14, 689, 692, 694.) Correia regularly denied muscle aches and painful joints; decreased sensation and pain in her extremities; tingling; numbness; balance difficulty; depressed mood; anxiety and sleep disturbance. (R. at 374, 381-83, 389, 391, 393, 410, 412, 478, 603, 689, 693.)

During the relevant time period, Correia was treated by Samuel Breeding, M.D., a physician with HMG Urgent Care for back and bilateral leg pain. Dr. Breeding consistently reported Correia's affect was normal; her lumbar spine was stable; she had diffuse tenderness of the lower lumbar area with palpation but no induration or discoloration; she had mildly guarded decreased range of motion; sitting straight leg raising tests were negative, bilaterally; she had no peripheral

---

[4] The relevant time period is July 11, 2017, the day after the ALJ's initial decision denying benefits and Correia's alleged onset date, and March 13, 2020, the date of the ALJ's decision at issue in this case.

[5] On February 1, 2017, Correia's examination findings showed diminished motor strength in her lower extremities. (R. at 392.) On April 19, 2018, Correia complained of a cough with shortness of breath at night; swelling of her throat; anxiety; and difficulty sleeping. (R. at 381-82.) Her examination findings showed she had slurred speech; she was anxious; and her mood was elevated and expansive. (R. at 380.)

edema; her sensation was intact; and her peripheral pulses were equal, bilaterally. (R. at 446, 450, 454, 458, 462, 624, 628, 632.) Correia often rated her pain level at three to four on a scale of one to 10 with medication and at six to 10 without medication. (R. at 445, 453, 457, 461, 465, 469, 622, 626.) Dr. Breeding ordered acupuncture treatments, which Correia reported were helpful. (R. at 451, 457.)

On June 6 and June 7, 2018, Correia presented to the emergency department at Mountain View for complaints of abdominal pain and vomiting. (R. at 674, 679.) On examination, Correia had some mild tenderness in the epigastric and right upper quadrant. (R. at 676.) A CT scan of Correia's abdomen and pelvis showed small stones in the gallbladder. (R. at 678.) Again, on June 22, 2018, Correia presented to the emergency department at Mountain View for complaints of epigastric abdominal pain. (R. at 666.) An abdominal sonogram showed no evidence of gastroparesis. (R. at 664.) Correia was diagnosed with NSAID induced gastritis and epigastric abdominal pain. (R. at 668.)

On August 23, 2018, Dr. Breeding completed a medical assessment, finding Correia could occasionally lift and carry items weighing 15 pounds and 10 pounds frequently; she could stand, walk and/or sit up to six hours each in an eight-hour workday and could do so for one hour without interruption; she could occasionally climb, stoop, kneel and balance, but never crouch or crawl; she had a limited ability to push/pull up to 15 pounds, and she would be absent from work about two days a month. (R. at 370-72.)

On September 17, 2018, Henry Price Viers, N.P.-C., a certified nurse practitioner at The Health Wagon, saw Correia for complaints of migraine headaches, which occurred three times weekly. (R. at 374.) Correia's objective

examination was unremarkable. (R. at 374-75.) Correia denied any anxiety or depressed mood. (R. at 374.)

On October 16, 2018, Viers completed a medical assessment, finding Correia could occasionally lift and carry items weighing five pounds and two pounds frequently; she could stand, walk and/or sit up to one hour each in an eight-hour workday and could do so for five minutes without interruption; she could never climb, stoop, kneel, balance, crouch or crawl; she had a limited ability to reach, to handle, to feel and to push/pull; and she was restricted from working around heights, moving machinery, temperature extremes, fumes and vibration. (R. at 401-03.) Viers opined Correia was unable to work. (R. at 403.)

On November 3, 2018, Dr. Wendy Abbott, D.O., a physician with Southern Medical Group, Inc., saw Correia at the request of Disability Determination Services. (R. at 405-08.) Correia alleged disability due to back pain, migraine headaches and fibromyalgia. (R. at 405.) She stated she fell down a flight of stairs a few days prior due to back spasms. (R. at 405.) Correia was independent with her activities of daily living. (R. at 405.) Correia was in no acute distress; she ambulated without assistance; she had an antalgic straight-legged gait; her grip strength was 5/5 with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally; her extremities had no edema, cyanosis or erythema; she was able to sit in no significant distress and walk and stand in the office; she was fully oriented and cooperative; she did not appear to be depressed or anxious; she was able to communicate with no deficits; her recent and remote memory were intact; she had good insight and cognitive function; she had good bilateral motor tone and strength in all muscle groups; her reflexes were normal; she had intact sensation; she had no muscle asymmetry, atrophy or involuntary movements; her

straight leg raising tests were negative; and she had some joint tenderness in the lumbar spine, but no signs of joint instability, inflammation or deformity. (R. at 406-07.) Dr. Abbott diagnosed low back pain likely secondary to her 2013 back injury. (R. at 407.)

Dr. Abbott opined Correia would "unlikely" be able to walk and/or stand for a full workday; she "may be" able to sit for a partial workday with allotted occasional breaks; she would be limited to lifting and carrying items weighing less than 10 pounds because her condition "may be" exacerbated by lifting or carrying excessive weight; and she should refrain from excessive bending, stooping and crouching. (R. at 407.)

On November 14, 2018, Richard Luck, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding Correia's anxiety and obsessive-compulsive disorders and depressive, bipolar and related disorders were non-severe. (R. at 86-87.) He opined Correia had no limitations on her ability to understand, remember or apply information; to interact with others; to concentrate, persist or maintain pace; and to adapt or manage herself. (R. at 86-87.) On March 4, 2019, Dr. Andrew Bockner, M.D., a state agency physician, completed a PRTF which mirrored that of Luck from November 14, 2018. (R. at 121-22.)

Also on November 14, 2018, Dr. Robert McGuffin, M.D., a state agency physician, completed a Physical Residual Capacity Assessment, finding Correia had the residual functional capacity to perform light work, except she could stand, walk and sit six hours each in an eight-hour workday; push/pull as much as the lift/carry restrictions; and occasionally climb, balance, stoop, kneel, crouch and

crawl. (R. at 89-90.) Dr. McGuffin opined Correia had no manipulative, visual, communicative or environmental limitations. (R. at 90.) On March 5, 2019, Dr. Wyatt S. Beazley, III, M.D., a state agency physician, completed a medical assessment, which mirrored that of Dr. McGuffin from November 14, 2018, except he found Correia had an unlimited ability to balance; she could frequently climb ramps and stairs, stoop, kneel, crouch and crawl; and she could occasionally climb ladders, ropes and scaffolds. (R. at 124-25.)

On November 16, 2018, Correia reported her medication prevented recurrent migraines. (R. at 410.) Viers reported Correia was in no acute distress and her examination findings were unremarkable, including having normal motor strength and sensation. (R. at 411.) Correia denied any anxiety or depressed mood. (R. at 410.)

On February 12, 2019, Correia saw Viers for shortness of breath at night and her examination showed rhonchi on the left and diminished breath sounds but was otherwise unremarkable. (R. at 478-79.) Correia, again, denied any anxiety or depressed mood. (R. at 478.) Viers diagnosed pneumonia. (R. at 478.)

From March 2019 to October 2019, Correia presented to the emergency department at Mountain View on four occasions for complaints of a cough and chest pain. (R. at 642, 649, 651, 653-54, 659.) She denied arthralgias; back pain; myalgias; dizziness; weakness; numbness; headaches; behavioral problems; and confusion. (R. at 643.) Chest x-rays showed no acute cardiopulmonary abnormalities. (R. at 653, 658, 662.) Correia's pulmonary examinations were normal; she was in no acute distress; she ambulated without difficulty; she was "very well-appearing;" she had normal range of motion with no lower extremity

edema, tenderness to palpation, erythema or swelling; she had tenderness to the left side of her chest and shoulder; she was fully oriented; she had normal coordination; and her mood, affect and behavior were normal. (R. at 644, 646-47, 649, 651, 656, 660.) Diagnosis management comments reflected to rule out pneumonia, acute pleurisy, acute coronary syndrome and pulmonary embolism. (R. at 661.) Correia was instructed to take ibuprofen for pain. (R. at 646.)

On March 15, 2019, Correia saw Viers for pain in her left side and cough. (R. at 476.) Viers reported Correia was in no acute distress; her heart had regular rate and rhythm with no murmurs; her lungs had scattered wheezes throughout, but good air movement; she had no edema in her extremities; she was alert, oriented and cooperative; she made good eye contact; and her speech was clear. (R. at 476-77.) Viers diagnosed abnormal electrocardiogram, ("ECG"), and chest pain, unspecified type, and referred her to a cardiologist. (R. at 477.)

On March 21, 2019, Correia saw Dr. R. Keith Kramer, M.D., a cardiologist at Wellmont Cardiology Services, for complaints of chest pain and dyspnea on exertion. (R. at 511, 514.) She denied irregular heartbeat, leg swelling, near-syncope and palpitations. (R. at 514.) Dr. Kramer reported Correia's cardiovascular examination showed normal rate, regular rhythm and no murmur; her carotid, dorsalis pedis and posterior tibial pulses were 2+; she exhibited normal effort and breath sounds; she had no decreased breath sounds, wheezes or rales; she had no edema or tenderness; she was fully oriented; and her behavior and judgment were normal. (R. at 515.) She had an abnormal ECG, and a stress test was ordered.[6] (R. at 515.)

---

[6] On April 9, 2019, a nuclear stress study showed normal left ventricular ejection fraction with no evidence of ischemia or infarction. (R. at 517-18.)

On March 28, 2019, Correia saw Sarah May, a licensed professional counselor with Family Preservation of Virginia, for psychosocial intact. (R. at 502-07.) Correia complained of panic attacks for the previous eight years. (R. at 502.) Correia complained that her back injury had worsened her panic attacks and depression. (R. at 502.) May diagnosed generalized anxiety disorder and major depressive disorder, recurrent, moderate. (R. at 506-07.)

On April 1, 2019, Leslie Davis, N.P.C., a certified nurse practitioner and Dr. Andrew Shaw, M.D., medical care providers with Family Preservation of Virginia, saw Correia for an initial psychiatric evaluation for anxiety and depression. (R. at 499.) Correia reported she had chronic pain, which caused her symptoms of depression and anxiety to worsen; difficulty sleeping; poor appetite; panic attacks; and anxiety. (R. at 499.) She stated she was unable to do the things she once enjoyed doing and she felt isolated, as she moved to be with her boyfriend and her family lived in Boston. (R. at 499.) On examination, Correia was well-groomed and cooperative; she made good eye contact; her speech was normal; she had no suicidal or homicidal ideations; she had full insight and good judgment; she was fully oriented; she had adequate attention and concentration; she exhibited no memory impairment; her mood was anxious and hopeful with an appropriate affect; her gait and posture were normal; her psychomotor activity was normal; and she had no abnormal movements. (R. at 500.) Correia was diagnosed with generalized anxiety disorder with panic attacks and major depressive disorder, recurrent episode, moderate. (R. at 499.)

On April 9, 2019, Davis completed a mental assessment, finding Correia was slightly limited in her ability to follow work rules; to relate to co-workers; to function independently; to understand, remember and carry out simple job

instructions; and to demonstrate reliability. (R. at 508-10.) She opined Correia had a satisfactory ability to deal with the public; to use judgment in public; to interact with supervisors; to maintain attention and concentration; to understand, remember and carry out detailed and complex job instructions; to maintain personal appearance; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 508-09.) Davis also found Correia had no useful ability to deal with work stresses and she would be absent from work more than two days a month. (R. at 508, 510.)

On May 14, 2019, Correia complained of left upper chest pain but denied shortness of breath and dizziness. (R. at 605.) Viers reported Correia's lungs had scattered wheezes throughout but good air movement. (R. at 605-06.) On June 7, 2019, Viers reported Correia was in no acute distress; her heart had regular rate and rhythm with no murmurs; her lungs were clear to auscultation, bilaterally; she had a normal gait; her motor strength was normal in her upper and lower extremities; she had normal strength, tone and reflexes; she was alert, oriented and cooperative; she made good eye contact; her mood and affect full range; and her speech was clear. (R. at 603-04.) On August 9, 2019, Correia saw Viers and reported her medications helped with her chronic health problems. (R. at 600-01.) Viers examination findings remained unchanged, except Correia had tenderness of the left upper chest wall with palpation (R. at 601-02.) Viers diagnosed essential hypertension and costochondritis. (R. at 602.)

On December 16, 2019, Correia saw Nicole Powers, F.N.P., a family nurse practitioner with Family Preservation of Virginia, and reported anxiety and some depression. (R. at 634.) Correia's mood was anxious, and she had a blunted affect,

but she was cooperative, with good eye contact and she had normal thought content and speech. (R. at 635.)

On December 16, 2019, Viers completed a medical assessment, finding Correia could lift and carry items weighing five pounds; she could stand and/ or walk[7] up to one and a half hours in an eight-hour workday and could do so for 10 minutes without interruption; she could never climb, stoop, kneel, balance, crouch or crawl; she had a limited ability to reach, to handle, to feel, to push/pull, to see and to hear; and she was restricted from working around heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity and vibration. (R. at 637-39.) Viers opined Correia was unable to work. (R. at 639.)

On December 19, 2019, x-rays of Correia's chest showed slight progression of apical scarring since 2015, with associated mild bronchiectasis, which warranted additional imaging. (R. at 640-41.) On January 3, 2020, Correia presented to the emergency department at Norton Community Hospital for complaints of mild chest pain. (R. at 703, 707.) Chest x-rays showed chronic obstructive pulmonary disease, ("COPD"). (R. at 699.) Correia was diagnosed with chest pain, non-specific. (R. at 711.) On January 31, 2020, Correia reported she had not been feeling down, depressed or hopeless. (R. at 689.) Viers reported Correia's examination was unremarkable. (R. at 689.)

### III.  Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2021). *See also Heckler v. Campbell*,

---

[7] Viers found Correia's ability to sit was affected but he did not indicate to what degree. (R. at 638.)

461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Correia argues the ALJ erred by improperly determining her residual functional capacity by rejecting the opinions of Dr. Breeding, Dr. Abbott, Viers and Davis. (Plaintiff's Brief at 7.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations

governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (2021) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[8]

Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. §§ 404.1520c(b), (c)(1)-(5), 416.920c(b), (c)(1)-(5) (2021) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1) (2021).

---

[8] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2) (2021). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. §§ 404.1513(a)(5), 416.913(a)(5) (2021).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (2021).[9] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. §§ 404.1520c(b)(2)-(3), 416.920c(b)(2)-(3) (2021).

---

[9] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. §§ 404.1520c(b)(3), (c)(3)-(5), 416.920c(b)(3), (c)(3)-(5).

A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a) (2021). The ALJ found Correia had the residual functional capacity to perform light work, except she could stand, walk and sit six hours each in an eight-hour workday; push/pull as much as the lift/carry restrictions; occasionally climb, balance, stoop, kneel, crouch and crawl; occasionally work at unprotected heights and around hazardous machinery; perform simple, routine tasks; make simple work-related decisions; and occasionally interact with supervisors, co-workers and the public. (R. at 18.)

In making his residual functional capacity finding, the ALJ stated he found Dr. Breeding's August 2018 opinion "partially persuasive." (R. at 26.) The ALJ acknowledged that Dr. Breeding's records often showed Correia had tenderness and decreased range of motion of the lumbar spine, with an occasionally antalgic gait, but typically his records showed her lumbar spine was stable; she had intact strength in her bilateral upper and lower extremities; she had negative straight leg raising tests, bilaterally, and she had intact sensation and reflexes. (R. at 26.) The ALJ stated there was no evidence to support Dr. Breeding's finding that Correia

required a sit/stand option, especially since she had good strength and sensation and lack of edema in her lower extremities. (R. at 26.)

As to consistency, the record shows Correia had a normal gait; full range of motion in her extremities; normal strength, tone and sensation; unremarkable neurological and psychiatric examinations; no edema, cyanosis or erythema; normal reflexes; no muscle asymmetry, atrophy or involuntary movements; and negative straight leg raising tests. In addition, the state agency physicians found Correia could perform a range of light work without a sit/stand option. Correia regularly denied back pain; muscles aches and painful joints; weakness; decreased sensation and pain in her extremities; tingling and numbness; balance difficulty; and headaches. On various office visits, she reported her pain level at three to four with medication, (R. at 445, 449, 457, 461, 465, 470), except in May, August and December 2019, when she rated her pain level at seven, nine and 10, because she had not taken her pain medication prior to the office visits. (R. at 622, 626, 630.) In August 2019, Correia reported her medications helped with her chronic health problems. (R. at 601.) In addition, Correia reported acupuncture helped her back pain. (R. at 457.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

The ALJ found Viers's October 2018 and December 2019 assessments "partially persuasive" because they were not fully supported by, or consistent with, the entire record. (R. at 25.) Viers opined Correia could lift and carry items weighing five pounds; that she could stand, walk and/or sit for five to 10 minutes without interruption; that she had limitations in reaching, handling, feeling, pushing and pulling; and she was restricted from working around temperature

extremes, pulmonary irritants and humidity. (R. at 401-03, 637-39.) The ALJ found these opinions were not supported by the medical evidence of record. (R. at 25.)

The ALJ found Correia had evidence of back pain consistent with her MRI findings, with documented limited range of motion of her lumbar spine and a stiff gait, but she did not use an assistive device. (R. at 25.) As noted above, Correia consistently had a normal gait; good strength and range of motion of her extremities; and normal strength, tone and sensation. In addition, the ALJ found the medical evidence did not support manipulative limitations or an inability to work around pulmonary irritants. (R. at 25.) Dr. Abbott reported Correia's grip strength was 5/5 with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally; she had good bilateral motor tone and strength in all muscle groups; she had intact sensation; and she had no muscle asymmetry, atrophy or involuntary movements. (R. at 406-07.) While the record shows that, on January 3, 2020, x-rays of Correia's chest showed COPD, her pulmonary examination findings that day were normal. (R. at 699, 708.) In fact, the record shows Correia's pulmonary examination findings showed her lungs were clear to auscultation, bilaterally; and she had normal breath sounds with no wheezes or rales, except on one occasion in May 2019, when she had scattered wheezes throughout, but good air movement. (R. at 515, 604-06, 656, 689.)

The ALJ also found Dr. Abbott's November 2018 opinion "partially persuasive" because it was inconsistent with her own examination findings and the other evidence of record. (R. at 25.) Dr. Abbott opined Correia would "unlikely" be able to walk and/or stand for a full workday; she "may be" able to sit for a partial workday with allotted occasional breaks; she would be limited to lifting and

carrying items weighing less than 10 pounds because her condition "may be" exacerbated by lifting or carrying excessive weight; and she should refrain from excessive bending, stooping and crouching. (R. at 407.) The ALJ found Dr. Abbott's opinion to be inconsistent with the other evidence of record which showed Correia did not exhibit evidence of any instability in her upper extremities or of decreased grip strength to support Correia would be limited to lifting and carrying items weighing 10 pounds. (R. at 25.) In fact, Dr. Abbott's examination findings were generally unremarkable except Correia had some joint tenderness in the lumbar spine. The ALJ also found Dr. Abbott's use of the words "may," "unlikely," "excessive" and "partial" to be vague and did not definitively define the extent of Correia's limitations. (R. at 25.)

The ALJ found Davis's April 2019 mental assessment "partially persuasive." (R. at 26.) The ALJ noted this assessment was a "check box form" with no explanation regarding her findings and appeared to be based primarily on Correia's self-reports. (R. at 26.) This court has found that check box forms are not entitled to great weight. *See Cooper v. Saul*, 2019 WL 6703557, at *10 (W.D. Va. Oct. 29, 2019) (citing *Gerette v. Colvin*, 2016 WL 1296082, at *6 (W.D. Va. Mar. 30, 2016) (form reports, in which a physician's only obligation is to check a box or fill in a blank, are entitled to little weight in the adjudication process); *Walker v. Colvin*, 2015 WL 5138281, at *8 (W.D. Va. Aug. 31, 2015) (check-box forms are of limited probative value); *Ferdinand v. Astrue*, 2013 WL 1333540, at *10 n.3 (E.D. Va. Feb. 28, 2013) (check-box forms are weak evidence at best); *Leonard v. Astrue*, 2012 WL 4404508, at *4 (W.D. Va. Sept. 25, 2012) (check-box assessments without explanatory comments are not entitled to great weight, even when completed by a treating physician)).

While Davis opined Correia had mild-to-moderate limitations in mental functioning but had a marked limitation dealing with work stresses as she "reports difficulty concentrating, difficulty sleeping, feeling tired [and] little interest in doing things," her examination findings showed Correia was well-groomed and cooperative; she made good eye contact; her speech was normal; she had no suicidal or homicidal ideations; she had full insight and good judgment; she was fully oriented; she had adequate attention and concentration; she exhibited no memory impairment; her mood was anxious and hopeful with an appropriate affect; her gait and posture were normal; her psychomotor activity was normal; and she had no abnormal movements. (R. at 500, 509.)

As noted by the ALJ, treatment records reflect similar findings and a stable mental status on a conservative course of mental health treatment. (R. at 26.) For example, in 2017 and 2018, Correia denied anxiety and depression and she was noted to have normal mood, memory and concentration. (R. at 385, 374, 407, 410, 668.) During a consultative medical examination in November 2018, Correia was able to hold a conversation, respond appropriately to questions and remember instructions. (R. at 407.) She did not show any signs of mood instability, concentration difficulty; her recent and remote memory were intact; and she had good insight and cognitive function. (R. at 407.) Thereafter, in February 2019, Correia reported depression in the context of lower back pain, but her examination was unremarkable. (R. at 478-79.) Dr. Breeding found she was pleasant with normal affect. (R. at 620.) In March 2019, Correia described herself as "resilient" and her mental status examination findings showed she was anxious and had limited insight, but she had no memory impairment; she had adequate attention and concentration and good judgment and impulse control. (R. at 502, 504-05.)

Based on this, I find substantial evidence exists to support the ALJ's consideration of the medical evidence and his mental residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.    Substantial evidence exists in the record to support the ALJ's consideration of the medical evidence;

2.    Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3.    Substantial evidence exists in the record to support the Commissioner's finding that Correia was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Correia's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioners decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     June 21, 2022.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE